**SOVEREIGN CAMP, W. O. W., v. MORAIDA.**

No. 9567.

Court of Civil Appeals of Texas. San Antonio.

June 26, 1935.

Rehearing Denied July 31, 1935.

Before DAVIS, Special Chief Justice, JONES, Special Associate Justice, and MURRAY, Justice.

I. W. Keys, of Corpus Christi, for appellant.

R. T. Pritchett, of Corpus Christi, for appellee.

DAVIS, Special Chief Justice.

Appellant is a fraternal, beneficiary association, having a lodge system, with rep-

resentative form of government, with a ritualistic form of work, and is incorporated under the laws of the state of Nebraska, with its home office in Omaha, and has a permit to do business in the state of Texas. It professes to be organized for the purpose of and to carry on its business solely for the benefit of its members and their beneficiaries, and not for profit.

Angela G. de Moraida, appellee, is the widow of Tomas Moraida, and is the beneficiary named in a certificate issued to her deceased husband by the appellant.

On August 21, 1933, appellee filed suit in the One Hundred Seventeenth district court of Nueces county against the appellant on such certificate issued to her deceased husband. The case was tried to the court, and at the conclusion thereof judgment in the sum of $1,000, with interest from March, 1934, at the rate of 6 per cent. per annum and costs of suit was rendered in favor of the appellee against the appellant on the 17th day of April, 1934. Appellant gave notice of appeal and thereafter duly perfected the same as required by law.

Appellee alleged that at the time of his death, Tomas Moraida had fully paid all the dues and assessments on the certificate issued to him and sued upon, and that all provisions in the certificate had been complied with, and that it was in full force and effect. Such allegations were denied in the answer of appellant, and as a further defense it pleaded that the deceased had allowed his certificate to lapse and to become null and void under the laws of the order, by reason of his nonpayment of the regular dues and assessments for December, 1933, and January, 1934, before the expiration of said respective months, and that he had not been legally reinstated under the laws of the order.

In reply thereto appellee pleaded a waiver of forfeiture for nonpayment of dues and assessments within the prescribed time by accepting payment of the same unconditionally after that time, and further pleaded that it had been the custom of the deceased and other members of the local camp, of which he was a member, to pay their monthly dues and assessments after the expiration of the month in which same, under the laws of the association, should be paid, and that appellant, with full knowledge of the date of said payments, had retained said dues and assessments, and that by reason of all of such actions on the part of the appellant, it had waived the condition of the certificate and was estopped from denying the validity thereof.

The facts material to the decision are as follows:

On April 24, 1931, Tomas Moraida duly executed a written application for membership in the local camp of the Woodmen of the World located at Corpus Christi, Tex. The application signed by him and attested by the clerk of the local camp, among other provisions, provides as follows:

"I hereby certify, agree and warrant that my being suspended or expelled from, or voluntarily severing my connection with the association, or any failure on my part to comply with the laws of the Association now in force or hereafter adopted shall make my beneficiary certificate void, and all rights of any person or persons thereunder shall be forfeited.

"I hereby consent and agree that this application, consisting of two pages, to each of which I have attached my signature, and all the provisions of the constitution, laws, and by-laws, of the association now in force or that may hereafter be adopted, shall constitute the basis for and form a part of any beneficiary certificate that may be issued to me by the Sovereign Camp of the Woodmen of the World, whether printed or referred to therein or not."

The beneficiary certificate which was issued to the insured provided, among other things, the following:

"This certificate is issued in consideration of the warranties and agreements contained in the application therefor, and in further consideration of the payment to the association of the sum of ———— dollars for the month in which this certificate is dated, and the payment to this association of $2.30 on or before the last day of each month thereafter, except as provided in the non-forfeiture options on page two hereof. This certificate is issued and accepted with the express agreement that the provisions and benefits contained on this and the three succeeding pages hereof, and in any authenticated riders attached hereto, form a part of this contract as fully as if recited over the signatures hereto affixed.

"I have read over the above certificate and accept the same, and warrant that I am now in good health and have not been

sick or injured since the date of my application.

"This the 9th day of June, 1931.

"[Signed] Tomas Moraida, Member."

The certificate further provided: "The Articles of Incorporation, the Constitution, Laws, and By-laws of the Association now in force, and all amendments to each thereof which may be made hereafter, the application for membership, including the medical examination signed by the member, and this certificate shall constitute the agreement between the Association and the member, and copies of the same, certified to by the signature of the · Association, shall be received in evidence as proof of the terms and conditions thereof."

By a stipulation, .counsel for appellee and appellant agreed that the constitution, laws, and by-laws of the appellant association, introduced in the record, were in force at the time of the death of the insured.

Section 63 of said constitution, laws, and by-laws of said association provides:

"(a) In order to accumulate and maintain funds for the payment of the benefits stipulated in beneficiary certificates ʹheld by the members of this Association, as and when such benefits accrue, to maintain the reserves thereon and to provide for the payment of the expenses of the Association, every member of this Association shall pay to the Financial Secretary of his Camp one annual assessment each year or one monthly installment of assessment each month, as required by these laws or by the provisions of his beneficiary certificate, which shall be credited to and known as the Sovereign Camp fund; and he shall also pay such Camp dues as may be required by the By-Laws of his Camp. Section 26 (g).

"(b) If he fails to make any such payments on or before the last day of the month he shall thereby become suspended, his beneficiary certificate shall be void, the contract between such person and the Association shall thereby completely terminate, and all moneys paid on account of such membership shall be retained by the Association as his liquidated proportionate part of the cost of doing business and the cost of the protection furnished on the life of said member from the delivery of his certificate to the date of his suspension. Such person, if in good health, may thereafter make a new contract with the Association, upon the same terms and conditions, by complying strictly with the provisions of these laws, contained in Sections 65, 66 and 67. See Section 26 (g)."

Section 64 of such constitution, laws, and by-laws provides as follows: "A person who becomes suspended for non-payment of assessments or installment of assessment is not entitled ·to any benefits of this Association, nor shall he receive the password or participate in any of the business or social proceedings of the Camp to which he had belonged."

Section 65 of such constitution, laws, and by-laws provides as follows:

"Any member who becomes suspended because of the non-payment of any installment of assessment, if in good health, may within three calendar months from the date of his suspension again become a member of the Association by the payment of the current installment of ·assessment and all installments of assessments which should have been paid to maintain him as a member. Whenever installments of assessments are paid by or for a person who has become suspended for the purpose of again making him a member, such payment shall be held *to warrant that he is at the time of making such payment in good health,* and to warrant that he will remain in good health for thirty days after such attempt to again become a member, and to contract that such assessments when so paid after he has become suspended for non-payment of assessments shall be *received and retained without waiving any of the provisions of this section, or of these laws until such time as the Secretary of the Association* (not financial secretary of local camp or lodge) *shall have received actual, not constructive or imputed, knowledge that the person was not in fact in good health when he attempted to again become a member.* Provided, that the receipt and the retention of payment of such installments of assessments in case such person is not in good health shall not make such person a member or entitle him or his beneficiary or beneficiaries to any rights whatever." (Italics ours.)

Section 66 of such constitution, laws, and by-laws provides as follows:

"(a) The retention by the Association of any installment of assessment paid by or for any person after he has become suspended in order to again make him a member, shall not constitute a waiver of any

of the provisions of this Constitution, Laws, and By-laws, or an estoppel upon the Association.

"(b) Any attempt by a suspended person to again become a member shall not be effective for that purpose unless such person be in fact in good health at the time and continue in good health for thirty days thereafter, and the payment of any unpaid installment of assessment shall be a warranty that such person is at the time in good health and that if the warranty is not true the certificate shall be null and void."

Section 109 (g) of such constitution, laws, and by-laws provides as follows: "The Financial Secretary shall not by acts, representations or waivers, nor shall the Camp by vote or otherwise, or any of its officers, have any power or authority to waive any of the provisions of the Constitution, Laws and By-Laws of this Association nor to bind the Sovereign Camp by any such acts."

Section 82 of the constitution, laws and by-laws of appellant association provides as follows:

"(a) No officer, employee, or agent of the Sovereign Camp, or of any Camp, has the power, right, or authority to *waive* any of the conditions upon which beneficiary certificates are issued, or to change, vary or waive any of the provisions of this Constitution or these laws, nor shall any *custom* on the part of any Camp or any number of Camps—with or without the knowledge of any officer of the Association— have the effect of so changing, modifying, waiving, or foregoing such laws or requirements. Each and every beneficiary certificate is issued only upon the condition stated in and subject to the Constitution and Laws, then in force or thereafter enacted, nor shall the knowledge or act of any officer or employee of this Association constitute a waiver of the provisions of these laws by the Association or an estoppel of this Association. (Italics ours.)

"(b) The Constitution and Laws of the Association now in force, or which may hereafter be enacted, the application and beneficiary certificate of membership shall constitute the contract between this Association and the member."

It was further stipulated by counsel that section 44-1251 of the statutes of the state of Nebraska (Comp. St. Supp. 1933), in which state appellant was formed and incorporated and has its principal office, provides as follows: "The constitution and laws of the society may provide that no subordinate body, nor any of its subordinate officers or members shall have the power or authority to waive any of the provisions of laws and constitution of the society, and the same shall be binding on the society and each and every member thereof and on all beneficiaries of members."

From the testimony and the evidence adduced at the trial and contained in the statement of facts now before us, the following additional undisputed facts appear:

On May 29, 1931, the Sovereign Camp of the order issued its beneficiary certificate in favor of Tomas Moraida. On June 9, 1931, by his signature affixed thereto and countersigned by Antonio R. Gonzalez, financial secretary of the local camp at Corpus Christi, Tomas Moraida accepted such certificate and thereby became a member of the order. As required by the certificate and rules of the order, on June 9, 1931, he paid the assessments and dues for that month required by the contract; on July 6, 1931, the record reflects he paid such assessments and dues for that month.

Thereafter in making such payments, Moraida did not comply with subsection (b) of section 63 of the constitution and laws of the order and pay these monthly payments on or before the last day of the month in which they accrued. Beginning with the payment required before the last day of August, 1931, he paid the same on September 8, 1931, and uniformly thereafter, up to and including the last payment made before his death, which occurred on February 16, 1933, such payments were not paid before the last day of the month in which they accrued, but were each paid in the next month succeeding their accrual. The payments were usually so paid by him around the fifth, sixth, and as late as the eighteenth day of the succeeding month. Without a break in their sequence, eighteen of such belated payments were made, including the two for December, 1932, and January, 1933, which were made respectively for December, 1932, on January 7, 1933, and for January, 1933, on February 4, 1933.

From the testimony, it further appears the indulgence of making such delayed monthly payments was not only extended by the local secretary of the camp to Moraida, but also to all the members of his lodge. Antonio Gonzalez, the secretary of the local camp, testified that he told all the

policyholders in the lodge that if they paid their premiums before he made out his monthly reports to the Sovereign Camp, they would be reported in good standing. He further testified that just so as they paid the premium before he sent off such report, he, upon the report, reported them in good standing. To quote part of his testimony in this respect: "If it was the last of the month of March, some paid March and April and some paid April and May, two months and I told them 'You are in good standing until the last of May.' In other words 'You have got it paid until June.'"

Gonzalez further testified that Moraida, the deceased, knew that he reported all persons who paid their premiums before he sent off his report each month as in good standing. The testimony of such custom and practice is corroborated by the record of such reports in the statement of facts. Despite the fact that Moraida was uniformly late in making his monthly payments, the local secretary's reports for the several months reflect him as being in good standing. Particularly is this true of such reports made by the secretary for December, 1932, and January, 1933; in each Moraida is reported as in good standing.

By virtue of section 105 of the constitution and laws, the president and secretary of the association appoint the financial secretary of each camp; by subsection (b) of this same section, it is provided that the financial secretary shall have charge of all accounts of the members and attend to the correspondence concerning the standing of the members; shall receive and receipt for the camp dues and the Sovereign Camp fund assessments and monthly installments thereof. He is required to make all reports and mail or deliver all notices required. Also to remit all funds due and belonging to the Sovereign Camp to the secretary of the association at the headquarters of the association. An indemnity bond was required of him for the faithful performance of his duties, in such sum as the president shall direct, the premium for such bond to be paid by the Sovereign Camp. In subsection (a) of same section referred to above, it is provided the financial secretary shall make all reports, mail or deliver all notices required of him by the board of directors, and such as are required by the laws of the association. In subsection (g) of the same section, it is

provided the financial secretary shall not by acts, representations, or waivers, nor shall the camp, by vote or otherwise, or any of its officers, have any power or authority to waive any of the provisions of the constitution, laws, and by-laws of the association, nor to bind the Sovereign Camp by any such acts.

Section III of the laws of the association provides that on or before the fifth day of every month, the financial secretary of each camp shall remit all the Sovereign Camp funds in his hands and all other funds due the association to the secretary of the association. The record discloses, so far as this case is concerned, in no instance did the financial secretary comply with the time limit of this last provision. His reports of December, 1932, and January, 1933, were dated respectively January 11, 1933, and February 10, 1933.

Section 110 provides that when any assessment, payment, or dues, in addition to the regular payment, is ordered in any one month, it is the duty of the financial secretary to notify each member of his camp of such assessment, but this section further provides that the failure of the financial secretary to do so should not relieve a person from the payment of assessments or dues according to the call or requirements of the Sovereign Camp and he shall stand suspended for the nonpayment of same as if he had received actual notice.

It further appears from the record that the deceased, Tomas Moraida, became sick on or about the 25th day of December, 1932, and his illness was continuous and uninterrupted from such time until his death on February 16, 1933.

From the undisputed testimony of Angela G. de Moraida, the wife of the insured and beneficiary in the certificate, it appears she paid her husband's dues and assessments for December, 1932, consisting of 25 cents camp dues and the $2.30 payment required by the Sovereign Camp, to Antonio R. Gonzalez, local secretary, on January 5, 1933, and she paid the same to him for January on February 4, 1933. When she made the payment in January for the month of December, her testimony is, she told Gonzalez her husband was sick in bed and he assured her that was all right and not to worry, and told her he would go to see Moraida if he was sick, and received the money. She further testified the same thing occurred when she made the Febru-

ary payment. Gonzalez received the money and gave her a receipt and told her the deceased was within his plain rights.

The testimony of Gonzalez is that some time in the last part of December or the first of January, he visited Tomas Moraida at his request, while a patient at the hospital. His testimony about the February payment is that the wife called him, he marked the assessment paid, told her everything was all right, and sent the money to Omaha, Neb.

After the death claim was presented, it was rejected. Appellant by letter dated May 5, 1933, inclosed a check in favor of appellee for the sum of $4.60, covering the payments of December and January, which was refused by appellee.

## Opinion.

By appropriate assignments of error and the propositions germane thereto, appellant challenges the action of the trial court in rendering judgment for appellee upon the certificate sued upon. It is contended that the insured having, by virtue of the terms of the contract, become suspended, had the right under section 65 above quoted to reinstate himself as a member in good standing within a period of three months from January 1, 1933, by the payment of his current assessment and all delinquent assessments within said three months' period, contingent, however, upon the insured, at the time of the attempted reinstatement, being in good health; that such payment or attempt at reinstatement constituted a warranty on the part of the insured that he was in good health; that section 66 specifically provides that in case such person is not in good health, that the certificate previously issued shall become null and void; that since the illness of Tomas Moraida was continuous and uninterrupted from the 25th or 26th of December, 1933, until his death on February 16, 1934, the delayed payments made by his wife in January and February were ineffective to constitute him a member of the Sovereign Camp, in good standing, at the time of his death, and under the terms of the contract, the constitution and the laws of the order being a part thereof, the association was within its rights in denying liability upon the policy.

Answering the contention of appellee that appellant had waived its rights to cancel the policy for nonpayment of assessments when due because of the payment by the insured to the financial secretary of the local camp of the delinquent monthly dues for December and January, and the retention of such dues by the order, the financial secretary at the time knowing of the illness of the insured, our attention is directed to the provisions of section 65 of the constitution, which provides that such assessments when so paid may be received and retained without waiving any of the provisions until such time as the secretary of the association has received actual, not constructive or imputed, knowledge that this person was not in fact in good health when he attempted to again become a member.

We are further reminded that section 66, heretofore quoted, is to the same effect; that the record contains a stipulation that the Sovereign Camp, nor the secretary of the association, nor any of its officers had actual knowledge, as distinguished from implied or imputed knowledge, if any, that the insured had become suspended from membership in said association by reason of the nonpayment of the assessment levied for the months of December, 1932, and January, 1933, nor did the association or its officers have actual knowledge as distinguished from implied or imputed knowledge, if any, that insured was not in good health prior to the time of his death; that section 82 further provides no officer, employee, or agent of the Sovereign Camp has any authority to waive any conditions upon which the certificate was issued, nor that any customs of any camp or any number of camps, with or without the knowledge of any officer of the association, shall have the effect of changing or waiving the laws of the association applying to issuance and acceptance of beneficial certificates.

Moreover, it is stated this last section has the sanction of article 4846, Revised Civil Statutes of 1925.

Counsel for appellant relies largely upon the case of Sovereign Camp, Woodmen of the World, v. Cameron (Tex. Civ. App.) 41 S.W.(2d) 283 (writ of error refused), to sustain the position assumed herein, and says the law announced therein should control the decision in this case. "It is seldom" says the appellant in its brief, "in the briefing of cases that one finds an authority based upon facts so similar to the facts in the case at bar."

To these statements we cannot agree. Admitting the court correctly applied the law in the Cameron Case, it does not fol-

low the law of that case should govern our decision, nor that if a different rule be adopted herein any conflict of decision should result. The reason for this is that a highly controlling and an entirely different and distinguishing state of facts exist in this case that are not to be found in the former.

According to the facts of the Cameron Case, the insured failed to pay his monthly assessments for the months of June and July, 1928; these delinquencies were reported to the Sovereign Camp by the local secretary and the consequent suspension of Cameron was received at the home office of the Sovereign Camp on August 16, 1928. On August 29, 1928, Cameron became sick and was carried to a hospital where he died September 1. On August 30, 1928, before Cameron died, a Mr. Bell presumably in a last minute effort to reinstate the Cameron benefit certificate and avoid the effect of his previous suspension, paid the clerk of the local Woodmen Camp installments for the months of June, July, August, and September. On September 14, 1928, the dues which were paid on August 30 were received at the home office of the order.

Unlike the facts of this case, it does not appear that Cameron maintained a practice of paying his monthly installments at times later than provided for in his policy, or that the clerk of his local camp allowed or permitted such practice. Nor does it appear that when Bell, two days before Cameron died, paid the four installments, he informed the local camp clerk, or the clerk from any other source knew of Cameron's illness. In these essentials lie the distinguishing features of the two cases.

By the custom of his local camp, acquiesced in and allowed by the local secretary, Moraida, for some eighteen successive months prior to his death, made his payments beyond the time limit provided for in his policy. Notwithstanding this fact, he was during all such time reported by the local secretary to the Sovereign Camp as being in good standing. During all such time, his standing in the order was not questioned by the association. There is nothing in the record to indicate Moraida could not have made such payments within the time appointed in the contract, if the association had so demanded, and it is evident from the practice he pursued in making his monthly payments that he relied upon the statements of his local secre-

tary that any such delinquency would not bring about a suspension or forfeiture of his certificate. It is further shown the local secretary accepted his December and January payments with full knowledge of his illness and in each of his respective reports for these months, reported to the Sovereign Camp, made no mention of the knowledge he possessed.

With such a different state of facts present in this case, the question then is, Did the continued indulgence or sanctioned practice of allowing Moraida to make his monthly assessment payments, and the two last made with full knowledge of his illness, beyond the last day of the month, constitute or create a new or at least a modified contract between Moraida and the association, or a waiver or estoppel sufficient to preclude the order from a denial of liability on the death claim presented by appellee?

If the question should be answered in the negative and the contract so construed, then it is to say that within a month or two after Moraida received his policy, he began paying out his money monthly for something he most desired but never obtained—financial protection for his family in case he died. Beginning with the payment he made in September, 1931, to satisfy the assessment due for the month of August of that year, he stood, according to the contract, suspended and his certificate forfeited unless for thirty days thereafter he remained in good health, and so with each succeeding payment to the time of his death.

After giving the matter full consideration, we believe, under the facts of this case, it more comports with reason, justice, and equity to answer the question propounded in the affirmative; to say the trial court rendered a proper judgment and that in affirming the same our decision will be in line with the law that has been established in this state in cases of similar import.

The reasons moving us to this conclusion may be thus stated:

The secretary of the local camp must be held to be the agent of the Sovereign Camp. Under section 105 of the constitution and laws of the order, he is appointed to office and may be removed at will by the president and secretary of the association. He is, therefore, the creature of the association. He has charge of all the accounts of the members and attends to the

correspondence concerning their standing and receives and receipts for the Sovereign Camp fund assessments and monthly installments thereof; he is charged with the duty of making all reports and mails or delivers all notices required; he further remits all funds due and belonging to the Sovereign Camp to the secretary of the association at its headquarters; and a bond is required of him by the association for the faithful performance of such duties.

■ An attempt is made by the laws of the association to greatly circumscribe his authority and to limit his powers as such agent, but such restrictions and limitations cannot be held to override the general law of this state pertaining to the relation of principal and agent. Fundamentally it may be stated that acting within the actual scope of his authority, the principal is bound by the acts of his agent; that notice to the agent under such circumstances is imputed to the principal. Bailey v. Sovereign Camp, 116 Tex. 160, 286 S. W. 456, 288 S. W. 115, 47 A. L. R. 876; Supreme Lodge, K. P., v. Withers, 177 U. S. 260, 20 S. Ct. 611, 44 L. Ed. 762.

Further it may be stated that when an association, such as appellant, has delegated to a subordinate officer some duty to be performed for the association, the latter is bound by the acts of its agent within the scope of the delegated duties and while performing same; that notwithstanding article 4846 of the Revised Statutes of 1925, which provides that subordinate bodies and officers of fraternal beneficiary associations cannot waive the laws and contracts of the association, the Supreme Lodge itself, or its officers acting within the scope of their official duties, have power to bind in that regard, and the general rules applicable to waiver and estoppel apply to their acts the same as to the acts of other corporations or individuals and their duly authorized agents. Bailey v. Sovereign Camp, supra; Calhoun v. The Maccabees (Tex. Com. App.) 241 S. W. 101; The Maccabees v. Johnson (Tex. Civ. App.) 273 S. W. 612; Sovereign Camp, W O. W., v. Hines (Tex. Civ. App.) 273 S. W. 927; Henton v. Sovereign Camp, 87 Neb. 552, 127 N. W. 869, 138 Am. St. Rep. 500.

When Moraida paid his monthly assessments or as in the case of his wife, who paid the last two payments prior to his death, the local secretary entered in Moraida's passbook the date such payments were made; he entered the same information on the records he kept for the benefit of the association; such secretary was further required by the association to report all sums collected by him, all the information touching the standing of the members of the local camp, and the matter of their suspensions. The matter of the serious sickness of a member should, therefore, as a part of his duties, have been reported to his superior officers. We find in this case he never reported the matter of Moraida's method of making belated payments or the fact of his sickness, but he accepted his money, forwarded it regularly to the association, which the latter accepted without question, and it was only after Moraida died that the association saw fit to examine the records of its local secretary to find some excuse upon which to base a refusal to pay the claim of Moraida's widow.

If the association had exercised some seventeen or eighteen months previously the same zeal to discover the standing of Moraida through all the months of his membership and the omissions of its local secretary to properly classify him in his monthly reports, the situation in which the association now finds itself would no doubt have been prevented.

Counsel for appellant argues that under the rules of the order, no other option was afforded the local secretary when Moraida made tender of his monthly payments than to accept the money and forward it to the association; that for this reason, the law of this case should be different from the holding in Bailey v. Sovereign Camp, supra. In that case it was held there was a waiver of forfeiture by the insured because the local clerk did not as a prerequisite to reinstatement require of the insured a written statement of good health and warranty in addition to payment of delinquent assessments. It is appellant's contention this is the distinguishing feature between the Bailey contract and the one at bar. Counsel for appellant contends that under the Bailey contract, the secretary was not required to accept tendered assessments without the written warranty; while under this contract, the secretary had no option other than to accept money when tendered, and such payment, under the terms of the contract, was a warranty of good health upon the part of the insured and that he would continue in such condition for a period of thirty days.

It may be admitted that in some respects the contract involved in the Bailey Case and the one at bar are different. The same principle of law, however, is applicable to both cases. In the Bailey Case, the omission of the local clerk to demand a health certificate from the member when he accepted delinquent payments constituted a waiver of forfeiture chargeable to his principal. In this case, the omission of the clerk to advise his principal that for some eighteen months it accepted monthly payments from the deceased after the time they became due constituted a waiver of forfeiture properly chargeable to the association.

Further, it may be said the local secretary had no part in the waiver except to act as a channel of information, but this circumstance cannot alter the ultimate liability of the association. The law will presume that the local secretary performed or should have performed the duty resting upon him and that he transmitted to the association all pertinent information received in line of such duty, and when the agent failed so to do, the knowledge of which he is in possession, but refrains from transmitting to the association, is imputed to the latter, the same as if it had received the payments under the circumstances stated.

For this same reason, the further fact that Moraida was not in good health when he made his payments for December and January will not relieve the association. The local secretary was fully advised of his sickness and payments made under those circumstances could not, as provided by the rules of the order, constitute a warranty of good health; the very information imparted by the wife of the husband's sickness was a denial of the warranty of good health which the rules provided the payment imputed.

It could not be contended that if Moraida had, in strict accordance with the contract, made his payments for December and January before the last day of each of these months, the condition of his health at such times of payment would have been in any wise material. The facts of this case disclose that a custom prevailed in the local lodge and was assented to by the local secretary that permitted Moraida to make such payments beyond their due dates, and that Moraida knew of such custom and relied upon it.

This brings us to a discussion of whether by reason of such conduct and custom of the local secretary of accepting from the deceased some eighteen monthly payments after the last day of the month in which they became due, the association is estopped to deny liability, the laws of the order to the contrary.

The provision requiring members to pay their monthly assessments before the last day of each month or suffer penalty of forfeiture was inserted in the contract by appellant for its own benefit; it was at liberty to waive it, and under the facts of this case, in our opinion it did waive such provision by the custom or practice that prevailed, upon which it appears the deceased relied.

■ The law applicable to the state of facts presented by this phase of the case is announced in 19 R. C. L. pages 1274, 1275, as follows: "Where a mutual benefit association has, in repeated instances, received from a member the payment of overdue assessments, so as to establish a custom of dealing between the parties, and lead the member to believe that a strict observance of a requirement as to the time of payment is not required, it is held that the certificate of insurance is not forfeited by failure to pay an assessment at the time when the by-laws of the society or a stipulation in the certificate requires it to be paid, provided it is paid within the customary period of extension of the time of payment, for the association is estopped by its course of conduct from claiming a forfeiture according to the strict letter of its contract * * * and it must be shown that the delinquent member had notice of the practice and relied thereon."

To the same effect see Supreme Lodge v. Hooper (Tex. Civ. App.) 282 S. W. 867 (writ of error refused); Southern Travelers' Association v. Masterson (Tex. Civ. App.) 48 S.W.(2d) 771, 777, wherein it is held that "insurer accepting 12 out of 20 premiums late * * * held estopped to claim forfeiture because certain premium was paid 8 days late." Also see Equitable Life Assurance Soc. v. Ellis, 105 Tex. 526, 147 S. W. 1152, 152 S. W. 625; Sovereign Camp W. O. W. v. Newsom, 142 Ark. 132, 219 S. W. 759, 14 A. L. R. 903; Sovereign Camp, W. O. W., v. Hines (Tex. Civ. App.) 273 S. W. 927; Bailey v. Sovereign Camp, W. O. W., 116 Tex. 160, 286 S. W. 456, rehearing denied in

288 S. W. 115, 47 A. L. R. 876; Modern Woodmen of America v. Harper (Tex. Civ. App.) 57 S.W.(2d) 863; Sovereign Camp, W. O. W., v. Helm (Tex. Civ. App.) 70 S.W.(2d) 213 (Writ of error refused).

Finding no reversible error, the judgment of the trial court is affirmed.

### On Motion for Rehearing.

JONES, Special Associate Justice.

■ The appellant has filed a motion for rehearing, insisting that the Cameron Case (Tex. Civ. App.) 41 S.W.(2d) 283, is identically in point and should be controlling in the case at bar. The very able original opinion of Special Chief Justice DAVIS, written in this case, clearly sets out the distinguishing features involved in this case and the Cameron Case. We are unable to see any similarity that would or could govern our decision in the case at bar. In the Cameron Case, the insured's practice was to make payment of his premiums by the last of the month; in this case Moraida had for eighteen months been making payment during the succeeding month, and as late as the eighteenth day thereof, when the contract provided that such payments should be made on or before the last day of the month. Again in the Cameron Case, Mr. Bell, in paying Cameron's dues, concealed from and did not reveal to the local secretary the then critical condition of Cameron; Moraida's wife, the appellee herein, on January 5, 1933, advised the local secretary of the appellant, at the time of making the December payment, that her husband was then sick, and again on February 4, 1933, when she was making the January payment, gave the same information to the secretary, and the secretary actually visited the insured at the hospital on one occasion some time during December or January. Moraida and his wife at all times acted in perfectly good faith. Certainly they were misled into believing that, while the payments were late, it would be satisfactory to the company, and the record shows that not only the appellee herein but all other members of the same lodge were doing the same thing, day after day, month after month, year after year, and upon familiar principles the knowledge thus obtained by the agent became and was in law the knowledge of the principal. Missouri, K. & T. Ry. Co. of Texas v. Belcher, 88 Tex. 549, 32 S. W. 518; Morrison et al. v. Insurance Company of North America, 69 Tex. 353, 6 S. W. 605, 5 Am. St. Rep. 63; 2 Tex. Jur. pp. 433, 434; Johnson v. Sovereign Camp, W. O. W. (Tex. Sup.) 83 S.W.(2d) 605. It cannot be gainsaid that a duty of election arose and was owed by the appellant to the policyholder, the performance of which duty of election was not undertaken until after his death, and then it was too late.

The appellee is entitled to recover for two principal reasons:

(1) The practice and custom of accepting payment of premiums for eighteen months after the last day of the month in which they were required to be paid waived the strict provisions of the contract of insurance concerning the time of payment and estopped the appellant to set up such grounds of forfeiture.

(2) The candid disclosure on the part of Moraida and his wife to the local secretary of Moraida's sick condition at the time the payments were made operated to impute this knowledge to appellant and to thereby estop it from claiming forfeiture or breach of warranty in failing to remain in good health for thirty days thereafter because of its unconditional acceptance of the payments of the premiums with knowledge of the insured's condition of health.

■ The appellant, in its motion for rehearing, urgently insists that the constitution and by-laws and article 4846 of the Revised Statutes of 1925, which greatly limit the authority of the local secretary, preclude any right of recovery, and that to hold otherwise is to invalidate such constitution, by-laws, and statute. To this, we cannot agree. The various restrictions and limitations placed upon the subordinate agent's authority are valid and proper within themselves and under certain circumstances are valid and binding, but it must be borne in mind that in construing them the fundamental principles of waiver and estoppel and the underlying rules of agency must necessarily be considered. In other words, these well-settled rules of law often operate, as we believe they do here, to destroy the effect of the strict and rigid provisions of a fraternal benefit policy of insurance. Sovereign Camp, W. O. W., v. Newsom, 142 Ark. 132, 219 S. W. 759, 14 A. L. R. 903.

■ The record reflects that the Sovereign Camp, for eighteen months, had been consistently, without exception, receiving

Moraida's payments after the last day of the month in which they were required to be paid. Its local secretary receipted for such payments and forwarded them to the home office. The books and records of the local secretary were the property of the Sovereign Camp. It had the undoubted right to inspect such records and to dismiss an unsatisfactory secretary at will. An investigation would readily have disclosed the condition of Moraida's practice of payment, but the appellant elected to keep its eyes closed, and to do its investigating only after Moraida's death. The reports of the local secretary to the home office have columns for only the name of the insured, the certificate number, and the rate of payment. Diligence and good faith on the part of the appellant, in determining and ascertaining the exact status of its members, would have required the local secretary to also indicate the date of payment of each member. This, it did not do. Moreover, the rules of the association provide that the local secretary make out such reports by the fifth day of each month. The local secretary invariably and without exception made the reports after such date. This practice within itself put the home office on actual notice that the local secretary might be holding up the forwarding of the report because certain members had not yet made payment. Whatever fairly puts a person upon inquiry is actual notice of the facts which would have been discovered by reasonable use of the means at hand. Hexter v. Pratt (Tex. Com. App.) 10 S.W.(2d) 692; 31 Tex. Jur. p. 360. But the appellant was content to completely ignore these indications of irregularity, and to later follow in the wake of death—when the grand hailing sign of distress could no longer be heard—with the pious plea of forfeiture.

■ Bearing these facts in mind, and considering that equity "abhors a forfeiture," we turn now to the doctrines of waiver and estoppel. In case of Sovereign Camp, W. O. W., v. Johnson et al. (Tex. Civ. App.) 64 S.W.(2d) 1084, 1087; Id. (Tex. Sup.) 83 S.W.(2d) 605, is this definition of estoppel: "The principle of estoppel is a salutary one, promoting justice and fair dealing. It is essentially an appeal to the conscience of the court, and it ordinarily involves some element of wrongdoing on the part of the person sought to be estopped which would render it inequitable to permit him to take advantage of his prior conduct. It applies to insurance companies and fraternal benefit societies to the same extent, and to the same extent only, that it applies to natural persons."

And in 21 Corpus Juris 1113 is this definition: "This (equitable) estoppel arises when one, by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts."

It cannot be gainsaid that Moraida was lulled into a false sense of security by the acts and conduct of the appellant in regularly accepting his payments subsequent to the required date of payment. "The letter of the law killeth, but the spirit maketh alive." This custom and practice—general in its nature—of accepting these delayed payments time after time constituted a waiver and consequent estoppel of the strict letter and provisions contained in the contract for time of payment. Supreme Lodge, K. P., v. Hooper (Tex. Civ. App.) 282 S. W. 867; Southern Travelers' Ass'n v. Masterson (Tex. Civ. App.) 48 S.W. (2d) 771.

■ There remains the question of the local secretary's limited authority, as provided under the by-laws and under article 4846, so as not to bind the association by his representations or acts constituting waiver. The original opinion herein by Special Chief Justice DAVIS, and the authorities therein cited, are conclusive on this point. It is true that, as a general proposition of law, the local agent or secretary, in his own right and under his own power, as an agent, had no authority by acts done or words spoken or otherwise to waive the provisions of the contract; nevertheless, while acting as a channel of information between the association and the insured, the knowledge he thus acquired and gathered while in the actual performance of the delegated duties imposed upon him is in law imputed to his principal, and this regardless of whether he actually conveys such information to his principal or not. Restrictions and limitations of authority in the contract here involved have relation to the agent only, and not to the association. They present

no obstacle to waiver by the association in any manner it might choose. Law v. Texas State Mut. Fire Ins. Co. (Tex. Com. App.) 12 S.W.(2d) 539. To hold otherwise would be to destroy and undermine the very pillars upon which rest the fundamental doctrines applying to principal and agent. It is presumed that the agent properly performed his duty, and made known to his principal all pertinent information relative to the transaction. The local secretary constituted the one and only means of contact provided for and existing between the association and the assured. His duties were to collect and receipt for payments, and to make monthly remittances and reports to the home office. His capacity was largely that of any local agent, yet the appellant contends that the provisions of forfeiture should be held good because the by-laws of the order by express provision do not create a local agent of the ordinary, full-fledged, black land, garden variety type, but by studiedly and designedly written by-laws attempt to bring into legal existence some species of hybrid, mal-formed creature, hobbling about performing his functions in a form bearing all the earmarks of an agent, for all intents and purposes to an ordinary layman, but whose cloak of authority is rudely ripped from his body when death stalks in the forests of the "woodmen," thus, for the first time, revealing to the beneficiaries of deceased brethren the ghastly skeleton of a synthetic agent, without power, without authority, and without dignity, whose conduct and acts within the circumscribed sphere of his activities, from a legal standpoint, do not even merit, and should not receive, as the appellant in effect contends, "the cold respect of a passing glance." This species of ghost-like fictitious nonentity, denominated an agent on paper by the appellant, is discussed by the United States Supreme Court in the case of Supreme Lodge, Knights of Pythias, v. Withers, 177 U. S. 260, 20 S. Ct. 611, 614, 44 L. Ed. 762: "The position of the secretary must be determined by his actual power and authority, and not by the name which the defendant chooses to give him. To invest him with the duties of an agent, and to deny his agency, is a mere juggling with words. Defendant cannot thus play fast and loose with its own subordinates. Upon its theory the policy holders had absolutely no protection. * * * The reports are by no means barren of cases turning upon the proper construction of this so-called 'agency clause,' under which the defendant seeks to shift its responsibility upon the insured for the neglect of Chadwick [its agent] to remit on the proper day. In some jurisdictions it is held to be practically void and of no effect; in others, it is looked upon as a species of wild animal, lying in wait and ready to spring upon the unwary policyholder, and in all, it is eyed with suspicion and construed with great strictness."

The lamented Chief Justice Fly, of this court, in the case of The Maccabees v. Johnson (Tex. Civ. App.) 273 S. W. 612, adopted the "wild animal" theory in disposing of that case and we here, as he there, are constrained to believe that under the facts of this case the local agent here may be likened unto some species of wild animal, whose legal existence should be carefully caged and watched and his operations kept within due bounds ere the creature, if allowed to roam at will, might tear asunder the very foundations upon which rest the doctrines of principal and agent. This creature of the association was for some eighteen months a tame and docile animal in the extensive forests and camps of the appellant, but the proof of death, when filed, caused a metamorphosis, much akin to that of Dr. Jekyll and Mr. Hyde.

The actual point of contact between an agent and his principal, in cases such as this, has been gradually cut down and narrowed by the appellate courts, the statute, and the by-laws of insurance companies and fraternal benefit societies, until at this time the principal is bound as, if, and only when the agent acts and speaks, or fails to act and speak when he should, while in the actual discharge and performance of his delegated duties and within the actual scope thereof, and it is only in that narrow channel when so acting are his acts, conduct, and knowledge imputed to his principal. Yet, this narrow line and point of contact is a golden thread that links the conscience of a court of chancery to the Ark of eternal right and justice. All the words in the language, however written or arranged in the constitution or in the by-laws, should not so operate or be construed by the court to remove or destroy that channel or point of contact. A study of the Texas cases reveals that year after year, when appellate decisions are written fixing liability under a given state of facts, that soon thereafter new,

changed, and other by-laws are substituted to meet the decisions, designed to defeat liability in a like case should it arise again. This character of agency provision is both dangerous and detrimental to the public welfare. Its complete sanction by the judiciary would undoubtedly result in chaos and injustice. If justice is the dictate of right and the virgin gold of the mine that passes for its intrinsic worth in every case, subject to a varying value according to the scales through which it passes (Duncan v. Magette, 25 Tex. 245), then that justice must be preserved by the judiciary of Texas, and the conscience of the court should be developed, broadened, and enlarged to keep pace with the age, so as to meet, keep, and preserve the public policy of the state as now established, by retaining and keeping within due bounds the limitations and curtailments of authority attempted to be placed upon the agent. The relationship of principal and agent, circumscribed as it is now, should not be further reduced by the operation of so-called "agency clauses," but kept within the confines of established jurisprudence; otherwise, in many such cases in the future, justice cannot be properly administered.

Under the general practice and custom of payment shown to exist, Moraida could and would have gone on through the years, but for his death, as the facts show he had been doing for more than eighteen months prior to his death, cherishing the belief that he was each month buying security and protection for his family, while the appellant during all of those months accepted these payments unconditionally, awaiting the fatal day when careful investigation would be in order and the local agent would be exposed to the world as a man of straw,

without life and without vitality, whose only function was, it appears, to "take the cash and let the credit go." Certainly such practice on the part of the appellant was "keeping the word of promise to his ear and breaking it to his hope." The authorities cited in the original opinion fully support our holding, that the knowledge of the local agent or secretary acquired, as it was, while acting within the actual scope of his delegated duties, is in law imputed to the appellant, and that the doctrines of waiver and estoppel removed from the case the provisions of forfeiture and the effect of article 4846 of the Revised Statutes of 1925.

The by-laws and this statute do not abrogate the well-established rules of the law of agency, by which the agent, by imputed knowledge, acts, or conduct, representations, making of records, by omissions of duty, or in any manner within the actual scope of his delegated duties, may bind his principal, either by waiver or estoppel or by both. Johnson v. Sovereign Camp, W. O. W. (Tex. Sup.) 83 S.W.(2d) 605. The power and authority of the agent, under this statute, to bind his principal is simply expressly limited to the scope of his employment. Our courts have uniformly refused to permit organized bodies of any kind or individuals to receive benefits derived from their agents without at the same time accepting a just and full measure of legal responsibility corresponding to and commensurate with the advantages received.

Finding nothing in the motion for rehearing to cause us to change our original opinion, the motion is accordingly overruled.

MURRAY, J., concurs.